IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Jessica Klausner, individually and on behalf of all others similarly situated,<br><br>       Plaintiff,<br><br>   - against -<br><br>Annie's, Inc.,<br><br>       Defendant | Case No. 7:20-cv-08467-PMH<br><br>First Amended<br>Class Action Complaint<br><br>Jury Trial Demanded |

  Plaintiff by attorneys alleges upon information and belief, except for allegations pertaining to Plaintiff, which are based on personal knowledge:

  1. Annie's, Inc. ("Defendant") manufactures, packages, distributes, markets, labels and sells Bunny Fruit Snacks – Tropical Treats fruit snack pouches under their Annie's Homegrown brand ("Product").

  2. The average consumer spends a mere 13 seconds making an in-store purchasing decision, or between 10 to 19 seconds for an online purchase.

  3. Faced with a large box and a smaller box, both with the same amount of product inside, consumers will choose the larger box because they think it is a better value.

  4. Defendant misleads and shortchanges consumers by falsely and deceptively misrepresenting the quantity of fruit snacks contained in each box of Product.

  5. Most studies show that 75 to 80 percent of average consumers do not look at any label information, no less the net weight, while they may look at the nutritional information.

  6. In other words, consumers are most likely not going to covert a net weight mentally to visualize how much product they are getting, but instead base their decision on the product's packaging and size.

7. Though a reasonable consumer does not expect the food package to be bursting at the seams, he or she does expect there to be an amount of product in the box that bears a reasonable relationship to the size of the package.

8. Slack fill is the difference between the actual capacity of a container and the volume of product contained therein.

9. Nonfunctional slack fill is the empty space in a package that is filled to less than its capacity for reasons which are illegitimate or unlawful.

10. Plaintiff, like all reasonable consumers, prior to the point of sale, could not and did not reasonably understand or expect any of the net weight or serving disclosures to translate to a quantity of fruit snack meaningfully different from their expectation of a quantity which would fill up the box.

11. Only upon opening their respective boxes did plaintiff and consumers discover to their shock and disappointment that it was less than half-full, while over half of the boxes constituted slack fill, virtually all of which was nonfunctional.

12. Defendant intentionally packages the Product in opaque cardboard containers that are constructed in such a way that does not allow for a visual or audial confirmation of the contents of the Product.[1]

13. The product package is made of heavy cardboard and the exterior dimensions are: 7 inches (height) by 4.5 inches (length) and 1.5 inches (width).

---

[1] Credit to David Greenstein.



14. The size of the box in and of itself is a representation by Defendant as to the amount of fruit snacks contained in the box.

15. Inside the cardboard package are 5 small flexible pouches each containing 0.8 oz/23g of product, for a total net product weight of 4 oz (115g).



16. Disclosures of net weight and serving sizes in a measurement of ounces or grams does not allow the reasonable consumer to make any meaningful conclusion about the quantity of fruit snacks contained in the Product's boxes that would be different from the reasonable consumer's expectation that the quantity of fruit snacks is commensurate with the size of the box.

17. Even if the consumers could view the inside of the package, they would only see five secondary packages, not knowing the amount of edible product in each package.



18. The secondary packages were themselves only about 50% full of edible product.



19. Based on the level of fill of the fruit snacks removed from secondary packaging, there is almost 79 percent slack fill, as shown by the fill to 1.5 inches based on 7-inch height (21.4 percent).




20. When separated, the Product's content appears as shown in the image below.




21. The sole purpose of the secondary packaging (the pouches) is to "bulk up" the interior of the cardboard adding to the deception that there is more product in the cardboard container than there actually is.

22. Consumers cannot know the weight of the individual fruit snacks in advance, such

5

that they would be put on notice about the small amount of product they will receive.

23. The Product cannot be shaken or otherwise manipulated to determine the amount of edible product contained in the package because the individual fruit snack pieces are within secondary packaging and congealed together therein, such that there will be little if any noticeable sound revealing the paucity of Product.

24. 21 C.F.R. § 100.100 ("Misleading containers.") provides that "a food shall be deemed to be misbranded if its container is so made, formed, or filled as to be misleading."

25. If a container contains non-functional slack fill, it is misleading if a consumer is unable to fully view the contents of the container.

26. Nonfunctional slack-fill is the empty space in a package that is filled to less than its capacity for reasons which fall outside of these "safe harbors."

27. There are acceptable and legitimate reasons for a product containing slack-fill – "safe harbors." 21 C.F.R. § 100.100(a)(1)-(6) ("Safe Harbors").

28. None of these safe harbors apply.

29. First, the contents of the container do not require the packaging to protect it from damage since the contents are not at risk of breakage. *See* 21 C.F.R. § 100.100(a)(1) ("Protection of the contents of the package").

30. The contents are packets of gelatinous fruit pieces, which cannot break or be damaged.

31. The product is not fragile or "delicate" such that outer packaging and secondary packaging in the sizes used are necessary.

32. Second, there are no requirements of the machines used to enclose the contents that would leave this large amount of empty space. *See* 21 C.F.R. § 100.100(a)(2) ("The requirements

6

of the machines used for enclosing the contents in such package").

33. The machines can be adjusted to use less cardboard to form the outer box and/or additional secondary packaging units can be added, reducing the empty space as shown below.

34. Third, no issue exists with respect to the contents of the container – including the SPUs and the product contained within – settling during shipping and handling. *See* 21 C.F.R. § 100.100(3) ("Unavoidable product settling during shipping and handling")

35. This is because the fruit snacks are of high density and naturally stick together due to their inherent stickiness, as shown in the image below.



36. No additional product settling occurs during subsequent shipping and handling.

37. The SPUs are filled in the outer box and immediately come to rest at the bottom of the outer box and are not otherwise suspended at a higher level in the box only to fall to the bottom during settling and handling.



38.     Based on the level of fill of the SPUs, the empty space constitutes over sixty (60) percent of the packaging, based on height of 17.8 centimeters with the SPUs taking up 7.1 cm.[2]

 

---

[2] 7.1 divided by 17.8 is 39.8 percent, and the empty space is 60.2 percent.

39. Though there *may* be a need for the secondary packaging to perform a specific function inherent to the nature of the food – distribution and consumption of the product in set amounts capable of being transported – in a lunchbox, purse, pockets, etc. – this safe harbor is not intended to provide for containers with over half of the box empty. *See* 21 C.F.R. § 100.100(4).

40. There is no reason the SPUs cannot be sold in smaller boxes or more of them added to the present box.

41. The outer cardboard box and secondary packaging units are not considered to be "reusable containers" and are not part of the presentation of the food and do not have value in proportion to the value of the product and independent of its function to hold the food. *See* 21 C.F.R. § 100.100(5).

42. The outer box and secondary packaging are discarded after consumed.

43. No inability exists to increase the level of fill or to reduce the size of the package to some minimum package size necessary to accommodate required food labeling or perform another purpose. *See* 21 C.F.R. § 100.100(6).

44. In fact, it is just as easy to design a smaller cardboard box, which would still be capable of holding the secondary packaging units and displaying all required labeling information.

45. Defendant can easily increase the quantity of fruit snacks contained in each Product container or, alternatively, decrease the size of the containers or change the label in a way that eliminates the deception such as, for example, adding a fill line, transparent window, or actual size depiction accompanied by the words "actual size."

46. There is no need for a tamper resistant device, as the Product is currently sold without such a device.

47. Therefore, the presence of a tamper resistant device cannot be said to be a barrier to

9

reducing the size of the outer box.

48. Because the package does not allow consumers to fully view its contents, and contains nonfunctional slack-fill, the packaging misleading to consumers.

49. Defendant intentionally designed the packaging to deceive Plaintiff and the class members.

50. The Product's packaging size was a material factor in Plaintiff's and consumers' decision to purchase the Products.

51. Plaintiff and Class Members expected to receive more Product than was being sold due to the Product's deceptive size and/or packaging.

52. As a result of Defendant's packaging, consumers purchased the Product and have been damaged.

53. Defendant's branding and packaging of the Product is designed to – and does – deceive, mislead, and defraud Plaintiff and consumers.

54. Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

55. The value of the Product that Plaintiff purchased and consumed was materially less than its value as represented by Defendant.

56. Had Plaintiff and class members known the truth, they would not have bought the Product or would have paid less for them.

57. As a result of the false and misleading labeling, the Product is an sold at a premium price, approximately no less than $4.89 per 32 OZ, excluding tax, compared to other similar products represented in a non-misleading way, and higher than the price of the Product if it were represented in a non-misleading way.

Jurisdiction and Venue

58. Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2)

59. Under CAFA, district courts have "original federal jurisdiction over class actions involving (1) an aggregate amount in controversy of at least $5,000,000; and (2) minimal diversity[.]" *Gold v. New York Life Ins. Co.*, 730 F.3d 137, 141 (2d Cir. 2013).

60. Plaintiff Jessica Klausner is a citizen of New York.

61. Defendant Annie's, Inc., is a Delaware corporation with a principal place of business in Minneapolis, Hennepin County, Minnesota and is a citizen of Minnesota.

62. "Minimal diversity" exists because Plaintiff Jessica Klausner and Defendant are citizens of different states.

63. Upon information and belief, sales of the Product in New York exceed $5 million per year, exclusive of interest and costs, and the aggregate amount in controversy exceeds $5 million per year.

64. Venue is proper in this judicial district because a substantial part of the events or omissions giving rise to the claim occurred in this District, *viz*, the decision of Plaintiff to purchase the Product and the misleading representations and/or their recognition as such.

65. This court has personal jurisdiction over Defendant because it conducts and transacts business, contracts to supply and supplies goods within New York.

Parties

66. Plaintiff Jessica Klausner is a citizen of New York, Monroe, Orange County.

67. Defendant Annie's, Inc. is a Delaware corporation with a principal place of business in Minneapolis, Minnesota, Travis County and is a citizen of Minnesota.

68. During the relevant statutes of limitations, Plaintiff purchased the Product within her district and/or State for personal and household consumption and/or use in reliance on the representations of the Product.

69. Plaintiff Jessica Klausner purchased the Product multiple times a year for at least the past three years, at stores including ShopRite, 785 NY-17M Suite 1, Monroe, NY 10950.

70. Plaintiff bought the Product at or exceeding the above-referenced price because she liked the product for its intended use and expected the Product to contain more of the fruit snacks than it did.

71. Plaintiff was deceived by and relied upon the Product's deceptive labeling.

72. Plaintiff would not have purchased the Product in the absence of Defendant's misrepresentations and omissions.

73. The Product was worth less than what Plaintiff paid for it and she would not have paid as much absent Defendant's false and misleading statements and omissions.

74. Plaintiff intends to, seeks to, and will purchase the Product again when she can do so with the assurance that Product's labels are consistent with the Product's components.

## Class Allegations

75. The class will consist of all purchasers of the Product who reside in New York during the applicable statutes of limitations.

76. Plaintiff seeks class-wide injunctive relief based on Rule 23(b) in addition to a monetary relief class.

77. Common questions of law or fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

78. Plaintiff's claims and basis for relief are typical to other members because all were

subjected to the same unfair and deceptive representations and actions.

79. Plaintiff is an adequate representatives because her interests do not conflict with other members.

80. No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

81. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

82. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

83. Plaintiff seeks class-wide injunctive relief because the practices continue.

New York General Business Law ("GBL") §§ 349 & 350
(Consumer Protection Statute)

84. Plaintiff incorporates by reference all preceding paragraphs.

85. Plaintiff and class members desired to purchase and consume products which were as described and marketed by Defendant and expected by reasonable consumers, given the product type.

86. Defendant's acts and omissions are not unique to the parties and have a broader impact on the public.

87. Defendant misrepresented the quantitative, substantive, qualitative, compositional and/or organoleptic attributes of the Product.

88. The net weight, serving size and opaque boxes fail to tell consumers how much of actual product is contained therein.

89. Plaintiff relied on the statements, omissions and representations of Defendant, and Defendant knew or should have known the falsity of same.

90. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

## Negligent Misrepresentation

91. Plaintiff incorporates by reference all preceding paragraphs.

92. Defendant misrepresented the quantitative, substantive, quality, compositional and/or organoleptic attributes of the Product.

93. The front label net weight of the outer box and secondary packaging units fails to tell consumers how much of actual product is contained therein.

94. Defendant had a duty to disclose the truth and knew or should have known same were false or misleading.

95. This duty is based on Defendant's position as an entity which has held itself out as having special knowledge and experience in the production, service and/or sale of the product type.

96. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant, a well-known and respected brand or entity in this sector.

97. Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the Product.

98. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

## Breaches of Express Warranty, Implied Warranty of Merchantability and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.

99. Plaintiff incorporates by reference all preceding paragraphs.

100. The Product was manufactured, packaged, labeled and sold by Defendant or at its express directions and instructions, and warranted to Plaintiff and class members that they

14

possessed substantive, quantitative, qualitative, organoleptic, and/or compositional attributes it did not.

101. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

102. The front label net weight of the outer box and secondary packaging units fails to tell consumers how much of actual product is contained therein.

103. Defendant had a duty to disclose the truth and knew or should have known same were false or misleading.

104. This duty is based, in part, on Defendant's position as one of the most recognized companies in the nation in this sector.

105. Plaintiff provided or will provide notice to Defendant, its agents, representatives, retailers and their employees.

106. Defendant received notice and should have been aware of these misrepresentations due to numerous complaints by consumers to its main office over the past several years regarding the Product, of the type described here.

107. The Product did not conform to its affirmations of fact and promises due to Defendant's actions and were not merchantable.

108. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

### Fraud

109. Plaintiff incorporates by reference all preceding paragraphs.

110. Defendant misrepresented the quantitative, substantive, qualitative, compositional and/or organoleptic attributes of the Product.

111. Defendant knew of the extra space in the boxes from previous complaints to its main office and declined to change the box size or add more SPUs.

112. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

## Unjust Enrichment

113. Plaintiff incorporates by reference all preceding paragraphs.

114. Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

## Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;
2. Entering preliminary and permanent injunctive relief by directing Defendant to correct the challenged practices to comply with the law;
3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;
4. Awarding monetary and statutory damages and interest pursuant to the common law and other statutory claims;
5. Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated: March 11, 2021

                                                     Respectfully submitted,

                                                     Sheehan & Associates, P.C.
                                                     /s/Spencer Sheehan
                                                     Spencer Sheehan
                                                     60 Cuttermill Rd Ste 409
                                                     Great Neck NY 11021-3104
                                                     Tel: (516) 303-0552
                                                     Fax: (516) 234-7800
                                                     *spencer@spencersheehan.com*
                                                     E.D.N.Y. # SS-8533
                                                     S.D.N.Y. # SS-2056

7:20-cv-08467-PMH
United States District Court
Southern District of New York

Jessica Klausner, individually and on behalf of all others similarly situated,

                             Plaintiff,

    - against -

Annie's, Inc.,

                             Defendant

First Amended Class Action Complaint

```
Sheehan & Associates, P.C.
 60 Cuttermill Rd Ste 409
 Great Neck NY 11021-3104
    Tel: (516) 303-0552
    Fax: (516) 234-7800
```

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated:  March 11, 2021

                                                              /s/ Spencer Sheehan
                                                                Spencer Sheehan